UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  07-23221-CIV-MORENO

| | |
|---|---|
| ANTHONY CLAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BUSINESS REPRESENTATION | ) |
| INTERNATIONAL, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### (WITH INCORPORATED MEMORANDUM OF LAW)

Dated:  April 10, 2008

Michael W. Casey, III
Florida Bar No. 141430
mcasey@ebglaw.com
Mark J. Beutler
Florida Bar No. 0023400
mbeutler@ebglaw.com
EPSTEIN BECKER & GREEN, P.C.
Suite 4300, Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Tel: (305) 579-3200
Fax: (305) 579-3201

Counsel for Defendant, Business Representation
International, Inc.

MI:161376v1

## Table of Contents

Memorandum of Law ...................................................................................................... 1

I.     Background ....................................................................................................... 1

     A.    Clay's Allegations ................................................................................ 1

     B.    Clay's Employment ............................................................................. 2

II.    Argument ........................................................................................................ 4

     A.    Summary Judgment Standard ............................................................. 4

     B.    Clay Offers No Competent Evidence of Disparate Treatment ............... 4

          1.    Disparate Discipline ................................................................ 4

               a.    BRI's Discipline of Clay Was Not "Disparate" ............... 6

               b.    Matos's Discipline of Clay Fails to Constitute a Materially Adverse Employment Action ......................... 8

               c.    Clay Offers No Evidence That His Discipline Was Pretexted .................................................................. 9

          2.    Hostile Work Environment .................................................... 11

     C.    Retaliation ....................................................................................... 14

     D.    Clay was Properly Compensated Under the FLSA ............................... 14

          1.    Clay Should Be Precluded From Advancing Legal Theories and Facts Which He Failed to Disclose in the Complaint, Statement of Claim, and Answers to Contention Interrogatories ............. 16

          2.    The FLSA Contains No "Failure to Make Prompt Payment" Cause of Action ...................................................................... 16

          3.    BRI is Entitled to Claim the Tip Credit .................................. 17

               a.    Skycaps are Tipped Employees .................................... 17

               b.    The Requirements for "Tip Retention" Have Been Met ............... 17

c.      Subsection 203(m)'s Notice Requirement Has Been Met .............17

4.      Clay's Job Duties Were a Normal and Customary Part
of a Skycap Job ........................................................................................19

Conclusion ....................................................................................................................20

## Table of Cases

In re Air Line Employees Association, Int'l, 6 NMB 703, 1979 WL 30282 (1979) ...................19

Anderson v. Cagle's, Inc., No. 06-10306 (11th Cir. 2007) ...........................................................17

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)...............................................................11

Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946) ....................................................3, 20

Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405 (11th Cir. 1998) ...........................14

Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311 (8th Cir. 1996)................................10

Bigge v. Albertsons, Inc., 894 F.2d 1497 (11th Cir. 1990) .........................................................10

Browder v. General Motors Corp., 5 F. Supp. 2d 1267 (M.D. Ala. 1998) ..................................16

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)................................................................8

CBOCS West, Inc. v. Humphries, 474 F.3d 387 (7th Cir. 2007) ..................................................14

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................................................4

Chapman v. AI Transport, 229 F.3d 1012 (11th Cir. 2000) ...............................................4, 10, 11

Cuddeback v. Florida Bd. of Educ., 381 F.3d 1230 (11th Cir. 2004)..........................................10

Damon v. Fleming Supermarkets of Fla. Inc., 196 F.3d 1354 (11th Cir. 1999)...........................10

Davis v. B&S, Inc., 38 F. Supp. 2d 707 (N.D. Ind. 1998)............................................................18

Davis v. Town of Lake Park , 245 F.3d 1232 (11th Cir. 2001) ......................................................9

EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263 (11th Cir. 2000) .................................................4

Embry v. Callahan Eye Foundation Hospital, 147 Fed. Appx. 819 (11th Cir. 2005)....................8

Faragher v. City of Boca Raton, 524 U.S. 775 (1998)................................................................11

Gilmour v. Gates, McDonald & Co., 382 F.3d 1312 (11th Cir. 2004).........................................16

Graham v. State Farm Mutual Ins. Co., 193 F.3d 1274 (11th Cir. 1999)......................................9

Hansborough v. Elkhart Parks & Recreation Dept., 802 F. Supp. 199 (N.D. Ind. 1992)...............5

Hardwick v. Complete Skycap Services, Inc., CV-04-0088 (D. Ariz. 2005)...............................18

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)..........................................................................11

Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982)............................................................12

Holder v. City of Raleigh, 867 F.2d 823 (4th Cir. 1989)................................................................7

Hollins v. Atl. Co., 188 F.3d 652 (6th Cir. 1999) ..........................................................................9

Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238 (11th Cir. 2004) .............................................11

Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306 (11th Cir. 1998) ......................................7

Kilgore v. Outback Steakhouse, 160 F.3d 294 (6th Cir. 1998) .....................................................18

Knight v. Baptist Hospital of Miami, Inc., 330 F.3d 1313 (11th Cir. 2003) ...................................8

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ..........................................................10

Meeks v. Computer Assoc. Int'l., 15 F.3d 1013 (11th Cir. 1994)..................................................10

Parrish v. Freightliner, LLC, 471 F. Supp. 2d 1262 (M.D. Fla. 2006) .........................................16

Pellon v. Business Representation International, Inc.,
   528 F. Supp. 2d 1306 (S.D. Fla. 2007) ............................................................................17, 19

Pennington v. City of Huntsville, 261 F.3d 1262 (11th Cir. 2001) .................................................6

Platner v. Cash & Thomas Contractors, Inc., 908 F.2d 902 (11th Cir. 1990) .................................7

Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192 (11th Cir. 1997) ..............................................9

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)............................................11

Shields v. Fort James Corp., 305 F.3d 1280 (11th Cir. 2002) ......................................................11

Singletary v. Missouri Dep't of Corrections, 423 F.3d 886 (8th Cir. 2005) ..................................12

Smith v. Papp Clinic, P.A., 808 F.2d 1449 (11th Cir. 1987)...........................................................7

Tumes v. AmSouth Bank, N.A., 36 F.3d 1057 (11th Cir. 1994)....................................................10

Vickers v. Federal Express Corp., 132 F. Supp. 2d 1371 (S.D. Fla. 2000) .....................................8

Walker v. Thompson, 214 F.3d 615 (5th Cir. 2000).......................................................................9

In re Williams, 298 F.3d 458 (5th Cir. 2002) ..........................................................................3, 20

Wilson v. B/E Aero., Inc., 376 F.3d 1079 (11th Cir. 2004)..........................................................8

Winfield v. St. Joe Paper Co., 1985 WL. 308 (N.D. Fla. 1985) ....................................................8

Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453 (11th Cir. 1997)...................................6

Defendant, BUSINESS REPRESENTATION INTERNATIONAL, INC. ("BRI"), by undersigned counsel, and pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L.R. 7.5, hereby moves for summary judgment. In support of this motion, BRI incorporates a memorandum of law and files contemporaneously herewith Defendant's Statement of Material Facts ("SOF"), with supporting declarations and deposition excerpts. BRI respectfully requests that the Court enter summary judgment in favor of BRI, and dismiss the Plaintiff's claims with prejudice.

## MEMORANDUM OF LAW

### I.   Background

#### A.   Clay's Allegations

The Plaintiff, Anthony Clay ("Clay"), an African American, filed suit against his former employer, BRI, alleging three counts: (a) disparate treatment under 42 U.S.C. § 1981; (b) retaliatory discharge under 42 U.S.C. §1981 in connection with his separation from employment on October 31, 2006; and (c) violation of the Fair Labor Standards Act's ("FLSA") prompt payment requirement.

Clay premises his disparate treatment claim on two theories: racially hostile work environment and disparate discipline. BRI contends that it disciplined Clay because of his chronic absenteeism, and denies that he was subjected to disparate terms and conditions of employment based on race.

Clay's retaliatory discharge claim alleges that he was terminated from his position because he filed a charge of discrimination with the EEOC six months prior to his termination. BRI contends that Clay was terminated because he refused to work the hours required of all BRI-employed skycaps in his department. [SOF ¶ 19].

Clay appears to have abandoned the "prompt payment" theory of FLSA liability alleged in the Complaint, and now alleges that BRI improperly claimed the tip credit because he was required to perform non-tipped work while being paid a tipped wage. In addition, Clay testified in his deposition that he worked "off the clock," which presumably Clay contends gives rise to a violation of the FLSA. [SOF ¶ 20]. BRI contends that skycaps are properly paid a tipped wage, and that Clay's pay exceeded the minimum required under the FLSA. [SOF ¶ 22].

Clay has advanced no claims under Title VII or state anti-discrimination or minimum wage law. Although Clay's pleadings contain vague allusions to BRI's failure to pay overtime,

Clay denies he worked any overtime.   [Clay at 44:1 to 45:8; 124:16-24 (excerpts to Clay's deposition, cited herein, are attached hereto as Exh. A].

**B.     Clay's Employment**

BRI employed Clay part-time as a skycap to provide porter and curb-side check-in services at Miami International Airport ("MIA") for United Airlines passengers. [SOF, ¶ 3]. Clay began his part-time employment on or about May 1, 2004. [SOF, ¶ 5].  For the entire time Clay worked at BRI, Clay was also employed full time with Miami-Dade Solid Waste Management ("MDSWM").  [SOF ¶ 16].  Clay was a tractor trailer driver, and was promoted to supervisor at MDSWM in May 2005, a position he currently maintains.  [Id.]

Although Clay was employed full time at MDSWM, Clay claims to have worked at BRI 8-hour shifts three days per week.  [SOF ¶17].  Clay claims that he was scheduled to work three days per week, but the work schedules Clay produced in discovery, in all cases, reflect that he was scheduled to work only two days per week.  [Id.]  BRI's records indicate that Clay worked only 52 days during the period beginning December 6, 2005 through his date of separation from employment (October 31, 2006), or roughly five days per month.  [SOF ¶19].  Clay testified that he frequently called in sick, even though he was not ill.  [SOF ¶18].

Clay now claims that he worked additional days "off the clock," but the Complaint makes no reference to off-the-clock work.  [SOF ¶ 20 and D.E. No. 1].  The dates on which BRI's records indicate that Clay was at work correspond exactly with the dates on which Clay reported his tips.  [SOF ¶21].

Throughout his employment with BRI, Clay was repeatedly subjected to discipline, usually for failure to report to work on days he was scheduled to work.  [SOF ¶22].  Clay also exhibited resistance to authority, counseling, and discipline.  [Id.]  The disciplinary actions that resulted in written notices in Clay's personnel file are too numerous to recount herein, but the Declaration of Nancy Duran, BRI's Human Resources Director, summarizes the facts pertaining to these notices, and provides supporting documentation.  [See SOF ¶¶23, 24(a) through 24(r)].

During the time Clay worked at BRI, there were approximately 17 skycaps assigned to Clay's department.  [SOF ¶ 10].  Six were African American. [Id.]  The department was split between those who served Delta passengers and those who served United passengers.  [Id.]  The two groups worked at different concourses. [Id.]  Clay was one of seven United skycaps.  [Id.]  Five were African American.  [Id.]  Of these five African Americans United skycaps, one was a

supervisor (Dereck Brown).  [Id.]  Julian Matos, Hispanic, also was a supervisor, and reported to Brown.  [Id.]  Clay alleges that Matos -- and only Matos -- acted with discriminatory intent.  [Id.]  Matos has since resigned his position with BRI.  [Duran Decl., ¶ 33(d)].

The seven United skycaps (five of whom are African American, including two African American supervisors) work in a small area where everyone is within view of one another.  [SOF ¶¶10-11].  Clay alleges that in this small workplace where African Americans dominate both in number and rank, one Hispanic employee created a racially hostile work environment, while working "side-by-side" with his African American superior.   None of the other African American skycaps who worked alongside Clay, or anyone else in Clay's department, complained to the Human Resources Department about Matos regarding a hostile work environment or any other form of race discrimination [SOF ¶12].   All employees are encouraged in the employee manual to alert the Human Resources Department of unlawful discrimination.  [Id.]

During his employment with BRI, four different supervisors or managers (including Matos) found it necessary to discipline Clay for violating work rules and policies, usually for the same infraction – failure to report to work as scheduled and obtain coverage for his shift.  [SOF ¶¶23-24].  In the majority of instances, Clay was disciplined by his supervisor-skycap captain, Derrick Brown, an African American.  [Id.]  Clay makes no claim that any of these supervisors - other than Matos – acted with racial animus or discriminatory intent.  [SOF ¶¶9-10].  Clay nonetheless contends that he was subjected to disparate discipline based on race.

Skycaps are tipped employees.  [SOF ¶22].  Clay's sole basis for claiming improper use of the tip credit is that he was deployed to perform non-tipped work while being paid a tipped wage.  [Clay at 93:17 to 94:2; 94:19 to 96:1].  The allegedly "non-tipped" work involved transporting passenger bags to TSA screening areas when United Airlines' conveyor belts were inoperative, and assisting handicapped passengers who required assistance with their wheelchairs.  [Id.]  Clay is unable to estimate the quantum of time committed to these allegedly "non-tipped" job duties.  [Clay at 97:23 to 104:8].  See In re Williams, 298 F.3d 458, 463 (5th Cir. 2002) (absent complete and accurate records, employee has burden to produce sufficient evidence to show the amount and extent of work "as a matter of just and reasonable inference.") (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946)).  Clay also claims that at times he worked "off the clock."  [SOF ¶20].  Neither the Complaint, Statement of Claim, or Clay's interrogatory answers reflect any "off the clock" work.  [SOF ¶20, D.E. Nos. 1 and 6].

## II.     Argument

### A.     Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The Eleventh Circuit has held that the "standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." Chapman v. AI Transport, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000).  That standard applies in employment discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale.  Id. at 1026. Summary judgment is appropriate, and in fact common, even in discrimination cases that turn on the employer's motivation and intent. See Id. ("[s]ummary judgment is hardly . . . rare[] in employment discrimination cases, more than 90 percent of which are resolved before trial . . ., many of them on the basis of summary judgment for the defendant." Chapman, 229 F.3d at 1025.

### B.     Clay offers no competent evidence of disparate treatment

In Count One, Clay alleges disparate treatment under two theories: disparate discipline and  racially hostile work environment.

#### 1.     Disparate discipline

Clay alleges that Hispanic employees fared better than he in disciplinary decisions. [Complaint ¶16].  Clay must prove that BRI disciplined him because of his race.  In the Eleventh Circuit, "disparate treatment claims require proof of discriminatory intent." EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1273-74 (11th Cir. 2000).

Clay identifies only one person whom he believes acted with discriminatory intent – skycap captain Julian Matos.  [SOF ¶9].  With two exceptions, the discipline Clay received was at the instance of persons other than Matos.  [SOF ¶23].  Clay was disciplined by virtually every supervisor he had, and usually for the same misconduct: failure to report for his scheduled shift, and failure to obtain coverage for those shifts.   [SOF ¶¶23-24].  Clay also demonstrated poor attitude.   He refused to discuss his concerns regarding unlawful discrimination, telling his superiors to "talk to my lawyer." [SOF ¶24(n)].

Matos disciplined Clay twice, once for violating BRI's policy prohibiting personal use of wireless telephones while on the curb, and once for disregarding the rotation when assisting a passenger.  [SOF ¶¶24(a)-24(b)].  Derrick Brown disciplined Clay for seven separate instances of unauthorized absenteeism.    [SOF ¶23].  Assistant Manager Norberto Nunez disciplined Clay for absenteeism twice. [Id.]   In addition, Kay Castellan, assistant to the Department Manager, disciplined Clay for absenteeism three times.  [Id.]

Thus, four separate supervisors found it necessary to discipline Clay for violating work rules and policies.  [Id.]  In most of the instances, Clay was disciplined by supervisor Brown, an African American.  [Id.]

Skycap captains are stationed at the curbside and work side-by-side.  [SOF ¶11].  Brown worked several feet away from Clay at the adjacent skycap podium and was in a position to observe Clay and Matos.  [Id.]  Both Clay and Matos worked for Brown.  [SOF ¶¶7-8].  It is implausible that Brown, an African American, would both tolerate racist comments and disciplinary decisions by his subordinate Matos, and also would engage in discriminatory disciplinary actions himself.  Federal civil rights statutes prohibit one African American from discriminating against another based on race, but a stronger showing of proof is required in that situation.  Hansborough v. Elkhart Parks & Recreation Dept., 802 F. Supp. 199, 206-207 (N.D. Ind. 1992) (holding that Title VII's ban on racial discrimination applies to cases in which both the alleged perpetrator and the alleged victim of racial discrimination belong to the same racial group, but requiring a substantial preliminary showing by the plaintiff to demonstrate that race, and not normal, personal antagonism, is responsible for the adverse employment decision.).  Rather than making the required "substantial preliminary showing," Clay neither alleges nor offers any evidence that Brown or anyone other than Matos acted out of discriminatory animus.  [SOF ¶9].

Federal civil rights law does not require BRI to abstain from normal and customary discipline for Clay's poor attendance merely because Clay filed a charge of discrimination with the EEOC.  A contrary rule would invite the filing of a charge of discrimination by any racial minority whenever he or she desired protection from discipline arising from poor job performance.

Because Clay makes no claim that Castellan, Nunez, Brown or anyone other than Matos acted with racial animus or discriminatory intent, Clay must demonstrate some evidence

connecting these supervisors' disciplinary decisions to Matos's alleged anti-African American animus.  Clay has put forth no such evidence because no such evidence exists.  Therefore, his claim must fail and summary judgment must be entered against him.  See Pennington v. City of Huntsville, 261 F.3d 1262, 1270 (11th Cir. 2001) (where decision maker makes independent adverse employment decision, decision is free of the taint of a biased co-employee) (citations omitted); Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1457-58 (11th Cir. 1997) (employee failed to show that employer's reason for terminating employee – lack of seniority – was pretext for discrimination in violation of ADEA; coworkers who made age-based comments were not shown to have participated in discharge decision).

BRI's supervisors had legitimate non-discriminatory reasons to enforce BRI's attendance policies and discipline Clay's chronic absenteeism.  Clay offers no evidence that these independent decisions were tainted by discriminatory animus.  Except for the two incidents of discipline initiated by Matos (discussed more fully below), Clay offers no evidence, and fails to even allege, that Supervisors Brown, Castellan and Nunez imposed discipline on him based on race.  To the contrary, Clay testified only about Matos harboring racial animus when questioned on the issue.  [SOF ¶9].  Because Clay offers no evidence, and in fact points to no persons other than Matos, who allegedly acted with racial animus in imposing discipline against him, the numerous disciplinary actions initiated by persons other than Matos are irrelevant to Clay's claim of disparate discipline.

### a.      BRI's discipline of Clay was not "disparate."

Clay complains of two disciplinary decisions initiated by Matos.  Clay was suspended on January 18 and March 21, 2006.  [SOF ¶24(a)-24(b)].  As a result, Clay was unable to work for whatever period remained in his shift on those days.

On January 18, 2006, Matos disciplined Clay because Clay assisted a passenger when it was not his turn based on a rotation.  [SOF ¶24(a)].  The situation thereafter escalated to where Clay used profanity directed at Matos.  [Id.]  Clay admits he used profanity.  [Clay at 188:24 to 189:2].  As a result, he was sent home for one day.  [SOF ¶24(a)].  In his written account of the incident, Clay wrote that "it truly was an honest mistake."  [See Exhibit B attached hereto].  Perhaps the situation did begin as an honest mistake, either on Clay's part by taking a customer out of turn, or on Matos's part for erroneously thinking that Clay had done so.  Clay testified that it was common to inadvertently take a customer out of turn.  [Clay at 144:1-3].  An honest

mistake does not give rise to liability under federal anti-discrimination law.  See Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1310-11 (11th Cir. 1998) ("We stress that . . . no plaintiff can make out a prima facie case [of disparate discipline] by showing just that she belongs to a protected class and that she did not violate her employer's work rule."); Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated [42 U.S.C.] § 1981.").   There is no evidence that African American skycaps were singled out for unique discipline.  Clay's coworker, Jorge Uscamayta (Hispanic) was suspended for one day for assisting a passenger out of turn. [Duran Decl., ¶ 34 and Exh. T attached thereto]. Victor Toledo (Hispanic) was suspended for one day for the same infraction.  [Duran Decl., ¶ 35 and Exh. U attached thereto].   Thus, the evidence establishes that similarly-situated skycaps outside Clay's protected class were similarly disciplined.

On March 21, 2006, (Clay believes the event occurred on February 18, 2006.  [Clay at 112:1 to 113:4]).  Clay was disciplined for violating BRI policy against using wireless telephones while in the work area.  [SOF ¶24(b)].  Clay claims he was not talking on the telephone, but rather was only looking on the LCD screen to ascertain who had called him.  [Clay at 113:7-10]. Clay believes that his discipline was discriminatory because "a similarly-situated Hispanic employee," the nephew of Matos, was not disciplined when he engaged in improper use of his wireless telephone. [Clay at 113:23 to 114:4].  Jose Rodriguez is the nephew of Matos.  [Clay at 57:17-18].  Like Matos, Rodriguez is Hispanic.

A racially discriminatory motive cannot be inferred from favoritism shown on the basis of family relationship.  See, Platner v. Cash & Thomas Contractors, Inc., 908 F.2d 902, 905 (11th Cir. 1990) ("'nepotism' by itself is not actionable under a disparate treatment analysis."); Holder v. City of Raleigh, 867 F.2d 823, 826-27 (4th Cir. 1989) (no discriminatory motivation when decision based on favoritism toward relatives even if reasons proffered were pretextual).  Again, similarly situated skycaps who are outside of Clay's protected class have been subjected to similar discipline. [See Exhibit C attached hereto at p. 2 noting that Clay's co-worker, Victor Toledo (Hispanic) was suspended for one day for using his wireless telephone in the curbside area) (document produced by Clay) and Clay at 181:3-21].

Even if Clay can find someone outside of his protected class who broke a rule, and

managed to escape discipline, that would not establish that Clay was disciplined because of race. Although employers cannot enforce work rules in a manner that discriminates against African Americans, employers have no obligation to ensure that no work rule infraction goes unpunished.  For every work rule, it will always be possible to find one or more employees who broke the rule and escaped discipline.  To defeat Clay's claim of disparate discipline, it is sufficient to demonstrate that one or more similarly situated persons outside Clay's protected class received the same discipline. See Winfield v. St. Joe Paper Co., 1985 WL 308, *16 (N.D. Fla. 1985) (in rejecting claim of disparate discipline, court noted that "defendant produced proof that white workers were reprimanded for specific instances complained of by testifying black plaintiffs").  The burden is on the Plaintiff to establish that persons outside of his protected class engaged in similar misconduct, and were disciplined differently than he.  Further, the burden is on the plaintiff to establish comparability.  Knight v. Baptist Hospital of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) ("To show that employees are similarly situated, the plaintiff must show that the 'employees are similarly situated in all relevant respects.")  "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Wilson v. B/E Aero., Inc., 376 F.3d 1079, 1091 (11th Cir. 2004).  To be "similarly situated" for purposes of disparate-discipline employment discrimination claim, employees must have been disciplined by the same supervisor.  Further, the plaintiff must establish that the supervisor imposing the discipline was aware of the infraction. See Vickers v. Federal Express Corp., 132 F.Supp.2d 1371, 1380 (S.D. Fla. 2000) ("Disparate discipline cannot be shown without first showing that the employer was aware of the comparator's misconduct.").  Because Clay cannot satisfy his evidentiary burden, summary judgment must be entered against him.

        **b.**        **Matos's discipline of Clay fails to constitute a materially adverse employment action**

De minimis employment actions like those alleged here are not materially adverse and, thus, are not actionable under federal anti-discrimination law.  See, e.g., Embry v. Callahan Eye Foundation Hospital, 147 Fed. Appx. 819 (11th Cir. 2005) (one day suspension without pay is not a materially adverse employment action actionable under Title VI); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits" (emphasis added)); Davis v. Town of Lake Park , 245 F.3d 1232, 1241 (11th Cir. 2001) ("to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment" (emphasis supplied))**.**

An adverse employment action is defined as a "materially adverse change in the terms and conditions of [plaintiff's] employment." Hollins v. Atl. Co., 188 F.3d 652, 662 (6th Cir. 1999). Courts routinely hold that imposition of discipline against an employee according to company policy is not a materially adverse employment action. See Walker v. Thompson, 214 F.3d 615, 629 (5th Cir. 2000) (de minimis loss of pay did not rise to level of adverse employment action).

Even if Clay could prove that the one-day suspension was impermissibly motivated, Clay fails to allege any other tangible employment action with respect to his compensation, terms, conditions, or privileges of employment. Accordingly, Clay fails to connect any racial animus harbored by Matos to any material adverse employment action.

Although all of BRI's warnings and disciplinary notices issued to Clay for his chronic absences were consistent with BRI's rules governing outside employment and attendance (see Exh. C to Duran Decl., Employee Handbook, pp. 5, 25), those warnings fail to constitute materially adverse employment actions under Title VII. Davis v. Town of Lake Park, 245 F.3d 1232, 1241 (11th Cir. 2001) ("Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. . . .Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives [regarding] job criticism or performance review"); Graham v. State Farm Mutual Ins. Co., 193 F.3d 1274, 1283 (11th Cir. 1999) (per curiam) (counseling memo expressing concern with plaintiff's improper absences and warning of possible ramifications "simply did not meet the 'threshold level of substantiality' required by the Eleventh Circuit").

### c.      Clay offers no evidence that his discipline was pretexted

Assuming Clay can establish a prima facie case, the burden would then shift to BRI to rebut the presumption of retaliation by providing a legitimate, non-discriminatory reason for the adverse employment action. Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1196 (11th Cir. 1997). Where, as here, the employer articulates a non-discriminatory reason for the adverse

employment action, the presumption of retaliation disappears, and the plaintiff must show that the employer's proffered reasons for taking adverse action were merely pretextual. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Summary judgment in favor of the employer is proper where the plaintiff fails to offer sufficient evidence demonstrating that the employer's stated reasons were pretextual. Cuddeback v. Florida Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004).

Moreover, a plaintiff is not allowed to recast an employer's proffered legitimate reason, or to substitute his business judgment for that of the employer. If the given reason is one that may motivate a reasonable employer, the plaintiff cannot succeed simply by quarreling with the wisdom of that reason. Chapman, 229 F.3d at 1030. The court will not sit as a "super-personnel department;" nor will it judge whether an employment decision is prudent or fair. Damon v. Fleming Supermarkets of Fla. Inc., 196 F.3d 1354, 1361 (11th Cir. 1999).  In rebutting the plaintiff's prima facie case, "a defendant employer must only produce credible evidence supporting its legitimate reasons. The employer does not bear the burden of persuasion." Bigge v. Albertsons, Inc., 894 F.2d 1497, 1501 (11th Cir. 1990).  BRI's burden in this regard is "exceedingly light."  Meeks v. Computer Assoc. Int'l., 15 F.3d 1013, 1019 (11th Cir. 1994).  BRI "need only offer admissible evidence sufficient to raise a genuine issue of material fact as to whether it has a legitimate reason" for its actions. Tumes v. AmSouth Bank, N.A., 36 F.3d l057, 1061 (11th Cir. 1994).

Chronic absenteeism and violation of work rules are legitimate non-discriminatory reasons to subject an employee to discipline.  See Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1316-17 (8th Cir. 1996) (employee's excessive absenteeism is a legitimate, nondiscriminatory reason for taking an adverse employment action).   BRI has presented substantial evidence that its actions were motivated, not by race, but by Clay's violation of work rules and chronic absenteeism.  The Eleventh Circuit has held that:

> An employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . .  Whether judgment as a matter of law is appropriate in any particular case will depend on the strength of the plaintiff's prima facie case, [and] the probative value of the proof that the employer's explanation is false.

Chapman, 229 F.3d at 1025 n.11 (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000)).[1]  Clay's inability to offer evidence of pretext is therefore fatal to his claim of disparate discipline.

### 2.    Hostile work environment

Clay alleges that he was subjected to a hostile work environment on account of his race. The standards for assessing a claim of a racially hostile work environment under Section 1981 are the same as under Title VII. Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002).

To establish a prina facie case of a racially hostile work environment, a plaintiff must show that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the terms and conditions of . . . employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). "To be actionable under Title VII, a hostile work environment must be both 'objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so.'"   Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1247 (11th Cir. 2004) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)).  "In assessing whether harassment is objectively severe and pervasive, courts typically look to: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." Hulsey, 367 F.3d at 1247-48 (quoting Faragher, at 787-88.)

Clay can point to only one individual – Julian Matos – who allegedly expressed racially offensive utterances.  [SOF ¶9].  Clay testified that Matos used the term "nigger" and "mooley." [Clay at 52:14 to 53:19].  Clay testified that "mooley" is Spanish for "nigger."  [Clay at 53:10-11][2].  None of the comments could be construed as physically threatening.   Further, Clay testified that these offensive terms were usually not directed against him but against other

---

[1]    Although the Chapman Court's language appears to apply to motions under Fed. R. Civ. P. 50, the Chapman Court was explicating the standards for summary judgment and noted that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" 229 F.3d at 1025 (quoting  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251 (1986)).

[2]    The term is actually Italian slang for dark skinned persons.  See http://www.urbandictionary.com/define.php?term=mooley.

African American co-workers.  [Clay at 55:10 to 56:1].  This evidence is insufficient as a matter of law to permit recovery on a theory of hostile-environment discrimination.  The conduct alleged is neither severe enough nor pervasive enough to be actionable under anti-discrimination law.

Although "nigger" is a demeaning term, "[t]he mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not affect the terms, conditions, or privileges of employment to a sufficiently significant degree to violate Title VII." Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982) (internal quotation marks omitted); see also Singletary v. Missouri Dep't of Corrections, 423 F.3d 886, 893 (8th Cir. 2005) (holding statements such as "that damn nigger," "damn black," "nigger s* *t, radio," "nigger-rigging," and "f* * *ing nigger," some of which, as here, were not directed at the plaintiff, insufficient to permit inference of hostile working environment ).

Further Clay testified that Matos oftentimes was absent from the worksite.  Clay testified that Matos slept for two hours every morning, at about the same time Clay arrived for work.  [Clay at 174:6 to 175:9].  Clay worked a four-hour shift.  [Clay at 60:12-13].  Stated another way, according to Clay, at least one-half of his shift was "harassment free."  [Clay at 174:6 to 175:9 and Exhibit B attached hereto].  Clay does not allege that he was subjected to a constant barrage of racial epithets.

Finally, the alleged conduct did not "unreasonably interfere with [Clay's] work performance."  Clay alleged in his Complaint at ¶11, and testified in his deposition, that at all times he performed his work duties in an "exemplary" manner.  [Clay at 49:16 to 50:4; 222:12-14].  Clay testified that his tip revenues remained strong. [Clay at 50:13-17; 222:16-22].  It seems that his tip reporting was not quite as strong, however.

During the time Clay worked at BRI, there were approximately 17 skycaps assigned to Clay's Department, although the number changed modestly during that period.  [SOF ¶10].  Six were African American (including one Haitian).  [Id.]  Skycaps in Clay's department served passengers of United Airlines, Avianca Airlines, and Delta Airlines. [Cantero Decl., ¶6].  United Airlines has one skycap podium with two computer terminals at the curb on concourse "F." [Cantero Decl., ¶7].  Acianca Airlines operates in the same location and had no separate skycap podium.  [Id.]  The Delta Airlines skycap podiums are located in concourse "H".  [Id.]  Due to spatial proximity of the three airlines' operations, the department was split between those

skycaps who served Delta Airlines passengers, on the one hand, and those who served United Airlines and Avianca airlines passengers, on the other hand.  [Id.]  Clay was part of the second group.  [Id.]  In that second group, there were only seven skycaps.  [Id.]  Five were African American.    [SOF ¶10].  Of these five African Americans skycaps, one was a supervisor -- Brown.  Matos (Hispanic) also was a supervisor, and reported to Brown.  [Id.]

These seven individuals, five of whom are African American, including one African American supervisors, work in a small area where the skycaps work within view of one another. [SOF ¶11].  It is implausible that in this small workplace where African Americans dominate both in number and rank, one Hispanic employee (Matos) could create a racially hostile work environment that is pervasive and severe by constant uttering of derogatory racial epithets, while working side-by-side with his superior, an African American.  Moreover, none of the other African American skycaps who worked alongside Clay, or anyone else in Clay's department, ever complained to the Human Resources Department about Matos regarding hostile work environment or other form of race discrimination, as all employees were encouraged to do in the employee manual.  [SOF ¶12].

An employee is not required to abandon his job to preserve his claim that the work environment is hostile, and in many cases, an employee dependent on his or her job might endure much abuse.  But Clay's situation is different, and his failure to quit his job belies his claim that he was subjected to severe and pervasive racial harassment.  Clay did not need his job at BRI. He had a full time job as a supervisor with MDSWM.  [SOF ¶16].  Clay's Forms W-2 for 2006, 2005 and 2004 indicate that his total earnings from skycapping were $1,647.90, $ 3,833.91, and $ 3,209.60, respectively.  [See Gallardo Decl., ¶ 11 and Exh. D attached hereto].  Assuming Clay did not falsify his earnings from tips, Clay could have earned as much as he did at BRI by working for minimum wage one day per week (instead of the three full days he claims to have worked at BRI).  Clay has done almost nothing to replace his job at BRI in the ensuing one and one-half years since he was terminated.  [Clay at 12:2-24].

A reasonable jury cannot conclude from these facts that Clay was subjected to a racially hostile work environment characterized by constant racial epithets uttered by Matos.  To be actionable, racial epithets uttered by co-workers must be shown to occur with such frequency that the very conditions of employment are altered.

### C.      Retaliation

In Count II, Clay alleges that his employment was terminated in retaliation for opposing unlawful discrimination.   Eleventh Circuit law presently holds that Section 1981 prohibits employers from retaliating against employees who complain about race discrimination in employment. <u>Andrews v. Lakeshore Rehabilitation Hosp.</u>, 140 F.3d 1405, 1411-12 (11th Cir. 1998).   However, there is presently pending before the United States Supreme Court a case in which the sole issue upon which the Court granted <u>certiorari</u> is whether 42. U.S.C. § 1981 prohibits retaliation. <u>See</u> <u>CBOCS West, Inc. v. Humphries</u>, 474 F.3d 387 (7th Cir. 2007), <u>cert. granted</u>, 128 S. Ct. 30 (Sept. 25, 2007) (No. 06-1431).   A decision is expected this Term.   In the event the Supreme Court holds that retaliation is no longer a cognizable theory of liability under Section 1981, Count II would have to be dismissed.

Even if the Supreme Court's decision in <u>CBOCS West</u> effects no change in existing law, Count II of Clay's Complaint must be dismissed.   Clay's deposition testimony eliminates any suggestion that he was terminated for impermissible racially-based reasons.

The only person who Clay testified harbors racial animus is Matos, a skycap captain. [SOF ¶9].   But in his testimony, Clay admitted that the decision to terminate him was made by the Department Manager Juan Carlos ("J.C.") Ballestos.   [SOF ¶19].   According to Clay's deposition testimony, Ballestos requested that Clay work a full five-day per week schedule.   [Id] Clay refused.   [<u>Id.</u>]   Ballestos indicated that he would be unable to employ Clay if Clay was unable to work five days per week.   [<u>Id.</u>]   Clay surrendered his identification badge and left, never to return.   [<u>Id.</u>]   Clay testified that he had no reason to think that this was not the real reason for his termination.   [<u>Id.</u>]   Clay testified that he knew of no skycaps in his department who were permitted to work fewer than five days per week, and in fact there were none.   [<u>Id.</u>]   Based on Clay's own deposition testimony, Clay was terminated for non-racial reasons which the law permits.   Clay advances no contention that the stated reason was pretextual.   Therefore, summary judgment on Count II must be entered against Clay.

### D.      Clay was properly compensated under the FLSA

Clay's FLSA claim has morphed beyond recognition from what Clay alleged in the Complaint.   In the Complaint, Clay alleges that BRI "violated the FLSA's prompt payment requirement" by failing to pay Plaintiff on the regular and customary paydays.   [Complaint ¶46].

The Complaint contains no allegation that Clay was not compensated for all time worked or that BRI's use of the tip credit was improper.  Clay testified that he had reviewed the Complaint, but could not recall whether that occurred before or after it was filed on December 11, 2007, [Clay 89:15-25], and that he had first retained his present counsel to assist him in prosecuting his claim for improper payment of wages in January of 2006 [Clay at 5:19 to 6:4], almost two years before he filed his complaint.

On December 27, 2007, as required by Order of the Court (D.E. No. 3), Clay filed a Statement of Claim. [D.E. No. 6].  Although Clay does not use the term "tip credit" in the Statement of Claim, Clay's challenge to the tip credit is implicit in the calculation of the total unpaid wages (which Clay computes as $23,212, liquidated).  Clay's calculation is flawed because Clay understates the wage he was paid ($3.38 versus  $2.13), and overstates the federal minimum wage applicable during Clay's employment ($5.15 versus $5.85).  Further, Clay calculates backpay for 156 weeks.  The FLSA's two-year statute of limitations would bar recovery for periods prior to December 11, 2005, and Clay was terminated on October 31, 2006, a period that spans 42 weeks.  Therefore, even if Clay worked 20 hours per week as he alleges in the Statement of Claim (but which BRI disputes), unpaid wages resulting from invalidation of the tip credit would result in back pay of approximately $2,974.[3]  The Statement of Claim reflects no claim for unpaid work and Clay appears to have abandoned any claim arising from violation of the FLSA's prompt payment requirements.

To further explore Clay's theory of liability under the FLSA, BRI propounded contention interrogatories to Clay, which Clay answered under oath on March 16, 2007, and which Clay served upon BRI on March 24.  Interrogatory nos. 10, 11, 12 and 13, 14 and 16 were specifically directed to ferret out the basis for Clay's FLSA claim.  With minor exceptions, Clay's answers to interrogatories simply incorporate the Statement of Claim.  [Clay's Answers to Interrogatories are attached hereto as Exhibit E].  Clay's interrogatory answers reflect no claim arising from unpaid work.  [Id.]

---

[3]   (20 hours per week x ($5.15-3.38) x 42 weeks x 2 for liquidated damages).

1.      **Clay should be precluded from advancing legal theories and facts which he failed to disclose in the Complaint, Statement of Claim, and answers to contention interrogatories**

Clay was represented by counsel in connection with his claim against BRI for improper payment of wages since January 2006.  [Clay at 5:19 to 6:4].  The Complaint was filed on December 11, 2007.  [D.E. No. 1].  Clay filed a Statement of Claim with the Court on December 27, 2007.  [D.E. No. 6].  On March 16, 2008, Clay served its answers to BRI's contention interrogatories wherein BRI sought the basis for Clay's FLSA claim.  [Exhibit E attached hereto].  In none of these pleadings did Clay allude to any theory of recovery based on unpaid work.  That theory was mentioned for the first time at Clay's deposition on March 25, 2007, two days before the close of discovery.  Clay had no explanation for his failure to previously allege that he worked "off the clock."  [Clay at 90:8 to 91:4].

Clay's failure to amend his pleadings to allege new facts and theories of liability precludes recovery based on the undisclosed legal theory.  See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1313 (11th Cir. 2004) (non-moving plaintiff may not raise a new legal claims in response to the opposing party's motion for summary judgment); Parrish v. Freightliner, LLC, 471 F.Supp.2d 1262 (M.D. Fla. 2006) (court barred plaintiff from advancing undisclosed legal theory because plaintiff failed to timely notify defendant of a wholesale change in liability theory until submission of her expert report raising the new theory and plaintiff failed to supplement interrogatory responses that had set forth a different theory as her sole liability theory); Browder v. General Motors Corp., 5 F.Supp.2d 1267, 1283-84 (M.D. Ala. 1998) (awarding summary judgment to defendant when plaintiff adopted new theories of recovery near the close of discovery).  The utility of procedural devices will be substantially compromised if plaintiffs are permitted to litigate facts and legal theories which they fail to disclose.

2.      **The FLSA contains no "failure to make prompt payment" cause of action**

The pay period for BRI's skycaps ends on the fifteenth and last day of each month.  [Clay at 83:17 to 84:5].  Clay testified that his paychecks are issued three or four days after the pay period closes.  [Clay at 84:6-21].  No case holds that failure to issue a paycheck on the last day of the pay period creates a cause of action under the Fair Labor Standards Act.

Skycaps record their hours worked and tips earned at the completion of each shift.  [SOF ¶24].  It is impracticable to require same-day payroll processing and issuance of paychecks for

several thousand employees.  The FLSA contains no such requirement.

### 3.   BRI is entitled to claim the tip credit

During the period Clay worked for BRI, the federal minimum wage was $5.15. However, employers can pay a reduced wage (no less than $2.13) to employees in tipped positions as long as the difference is made up in tips.  This is referred to as the "tip credit." Under 29 U.S.C. § 203(m), tipped employees, like skycaps, can be paid the reduced wage provided the employer meets certain requirements.

The tip credit is not an exemption.  The tip credit is embodied in the definition of the required minimum wage set forth in 29 U.S.C. § 203(m).  The distinction is important. Exemptions are strictly construed against the employer whereas, under Eleventh Circuit law, definitions are given a more even-handed construction.  Anderson v. Cagle's, Inc., No. 06-10306 (11th Cir. 2007) (unlike FLSA exemptions contained in Section 213, definitions set forth in Section 203 which limit the scope of the key FLSA provisions are construed consistent with their plain meaning, and not interpreted rigorously against the employer); Pellon v. Business Representation International, Inc., 528 F.Supp.2d 1306, 1310-12 (S.D. Fla. 2007) (same holding in context of tip credit), appeal docketed, No. 08-10133-E (11th Cir., Jan. 2, 2008).

To qualify for the tip credit, the employer must: (a) take the tip credit toward the wages of employees who qualify as "tipped employees"; (b) provide notice to the employees of the provisions of 29. U.S.C. § 203(m); and (c) ensure that all tips received by such employee have been retained by the employee.  See 29 U.S.C. § 203(m).  These conditions are met in this case.

#### a.   Skycaps are tipped employees

A "tipped employee" is an employee engaged in an occupation in which he customarily and regularly receives more than $30 per month in tips. 29 U.S.C. § 203(t).  There is no dispute that these requirements are easily met in this case [SOF ¶22].

#### b.   The requirements for "tip retention" have been met

To claim the tip credit, the employee must retain all tips.  There is an exception for tip pooling arrangements, but BRI skycaps do not pool their tips.  Clay testified that he was permitted to retain all tips received from passengers.  [SOF ¶23]

#### c.   Subsection 203(m)'s notice requirement has been met

Clay concedes by implication that the notice requirement for claiming the tipped credit was satisfied.  Clay excludes improper notice from among the reasons he contends should

invalidate the tip credit.  [Exhibit E attached hereto].

When Clay was hired in May 2004, he was informed that he would receive $2.15 per hour (later increased to $3.38), and that the remainder of his pay would be in tips.  [Clay at 24:7-21; 26:8-13].   When Clay took his job with BRI, Clay knew that skycapping was a tipped occupation, that he would be paid a tipped wage, and that tips were an important component of their compensation.  [Id. and Clay at 19:6-21].  Clay had worked as a skycap before working at BRI for three different air service providers where he was paid a tipped wage.  [Id.]  Clay's wage and tips were reflected on each bi-monthly paycheck.  [SOF ¶30].  Clay's paycheck informed him of his hourly rate, his total their total wages, the number of hours worked, and the total tips he reported during the pay period.  [Id.]  See Hardwick v. Complete Skycap Services, Inc., CV 04-0088, p.11  (D. Ariz. 2005) (unpublished opinion attached hereto as Exhibit F) ("[the employer] explained to Plaintiffs that they would receive $2.13 per hour, the remainder of their pay would be in tips, and they would work under a tip pooling program.  This explanation is sufficient to satisfy the notice requirement of [Section 203(m)].") (citing Kilgore v. Outback Steakhouse, 160 F.3d 294, 298 (6th Cir. 1998)) (quotation omitted).

Cases construing Section 203(m) have held that notice can be accomplished by posting. Davis v. B&S, Inc., 38 F. Supp. 2d. 707, 718-19 (N.D. Ind. 1998).  The Department of Labor ("DOL") requires employers to post a notice which includes certain information germane to the tip credit.  The Wage and Hour Division of the DOL has approved the following language:

> Tip Credit – Employers of "tipped employees" must pay a cash wage of at least $2.13 per hour, if they claim a tip credit against their minimum wage obligation. If the employee's tip, combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference.  Certain other conditions must also be met.

Wage and Hour Publication 1088.  The publication also requires that the $5.15 (now $5.85) minimum hourly wage be posted in large letters.

BRI prominently posted the afore-described tip credit information in a prominent location adjacent to the time clock where employees clock in and clock out each day.  [SOF ¶¶32-33]. There is no alternative location where this tip credit information could have been given greater exposure. (Id.)  The notice was posted for the entire period relevant to this litigation.  [SOF ¶32]. Clay admits that the FLSA poster was posted near BRI's time clock where he punched in and out each day.  [Clay at 133:7 to 134:24].

This Court previously held that the prominent posting of Publication 1088, coupled with providing the above-described information to employees, satisfied Section 203(m)'s notice requirement.  Pellon, 528 F. Supp.2d at 1310-12.

**4.      Clay's job duties were a normal and customary part of a skycap job**

Clay contends in his interrogatory answers that BRI improperly applied a tip credit to those portions of his shift in which he performed tasks which he believes are beyond the scope of the tipped occupation.  [Exhibit E attached hereto].  Clay singles out three job duties which he alleges constitute "non-tipped" work: (a) assisting handicapped passengers with their wheelchair; (b) carrying passenger baggage to TSA screening areas when the United Airlines luggage conveyor belts were inoperative; and (c) assisting cruise ship passengers. [4]  [Id.]  Significantly, Clay is unable to provide an estimate of the time committed to these allegedly non tip producing tasks, which would preclude recovery.  [Id. and Clay at 97:23 to 104:8].

Assisting handicapped passengers with their wheelchairs is tipped work.  [SOF ¶28].  The National Mediation Board, the federal agency that supervises labor relations and defines collective bargaining units in the airline industry, has regarded the following as among the "basic responsibilities" of skycaps: (a) transporting passengers' baggage, (b) performing curbside check in, (c) assisting handicapped passengers boarding, deplaning and connecting, and (d) keeping the baggage claim area clean and ensuring the neat and orderly appearance of the baggage and curb check-in areas.  In re Air Line Employees Association, Int'l, 6 NMB 703, 714, 1979 WL 30282, **9.  This Court reached the same conclusion in Pellon, 528 F. Supp.2d at 1313-15.  Clay testified that assisting handicapped passengers was among his responsibilities at each of his prior positions with different skycap employers where he was paid a tipped wage.  [Clay at 128:15-25].  BRI permitted him to accept tips from handicapped passengers, who frequently paid tips.  [Clay at 129:1-10].

The FLSA permits an employer to take the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips, provided such duties are incidental to the regular duties, and are generally assigned to such

---

[4]   In his March 25, 2007 deposition, Clay testified that (a) assisting cruise ship passengers is in fact part of his tipped occupation, and his complaint is simply that cruise ship passengers are stingy tippers.  [Clay at 158:3-23].  So long as Clay earns at least $30 per month in tips, the parsimonious tipping habits of cruise ship passengers will not preclude BRI from claiming the tip credit.

occupations. 29 C.F.R. § 531.56 (distinguishing between employees assigned dual jobs, such as a waiter who is also employed as a maintenance man, and employees assigned a single, tipped job, which includes incidental duties, such as a waitress who must also toast bread, make coffee, and set tables).  It is undisputed that the tasks about which Clay complains are tasks routinely performed by skycaps.  [Lovett Decl., ¶¶ 22-23].  Each task is a normal, regular and customary part of a skycaps' job duties.  [Id.]  Based on the uncontradicted sworn testimony, performing these tasks as a regular part of their skycap job.  [Id.]

Finally, Clay testified that he was unable to provide an estimate for the time committed to these allegedly non-tipped job duties.  [Clay at 97:23 to 104:8].  This inability precludes Clay's from recovering on his dual occupation theory. See In re Williams, 298 F.3d 458, 463 (5th Cir. 2002) (absent complete and accurate records, "employee has burden to produces sufficient evidence to show the amount and extent of work "as a matter of just and reasonable inference.") (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946)).

## CONCLUSION

For the above-stated reasons, BRI respectfully requests that the Court enter summary judgment in favor of BRI, and dismiss the Plaintiff's claims with prejudice.

Dated:   April 10, 2008

<div style="margin-left:40%">

**s/ Mark J. Beutler**

Michael W. Casey, III (FBN 141430)
MCasey@ebglaw.com
Mark J. Beutler (FBN 0023400)
MBeutler@ebglaw.com
EPSTEIN BECKER & GREEN, P.C.
Suite 4300, Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Tel: (305) 579-3200 | Fax: (305) 579-3201

Counsel for Defendant, Business Representation International, Inc.

</div>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  07-23221-CIV-MORENO

| | |
|---|---|
| ANTHONY CLAY, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BUSINESS REPRESENTATION | ) |
| INTERNATIONAL, INC., | ) |
| | ) |
|       Defendant. | ) |
| | ) |
| _____ | ) |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of April, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**s/ Mark J. Beutler**
Mark J. Beutler

21

<u>**SERVICE LIST**</u>

**Anthony Clay v.**
**Business Representation International, Inc.**

**Case No. 07-23221-CIV-MORENO-Simonton**
**United States District Court, Southern District of Florida**

Anthony M. Georges-Pierre, Esq.
Remer & Georges-Pierre, P.A.
100 North Biscayne Boulevard
Suite 2800
Miami, Florida  33132
Tel: (305) 416-5000
Fax: (305) 416-5005
Counsel for Plaintiffs


[Via Notice of Electronic Filing generated by CM/ECF]